UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
No. 22-CV-464

| | |
|---|---|
| Jeremy RIDDLE,<br><br>    Plaintiff,<br><br>v.<br><br>SHERBURNE COUNTY, a municipal entity; SHERBURNE COUNTY JAIL, regional correctional facility; Joel BROTT, Sheriff of Sherburne County, individually and in his official capacity; Brian FRANK, Jail Administrator at Sherburne County Jail, individually and in his official capacity; Diana VANDERBEEK, Nursing Director at Sherburne County Jail, individually and in her official capacity; Melissa BURGESS, Medical Provider at Sherburne County Jail, individually and in her official capacity; SHERBURNE COUNTY JAIL MEDICAL STAFF; and,<br><br>ANOKA COUNTY, a municipal entity; ANOKA COUNTY CORRECTIONS & WORKHOUSE, regional correctional facility; Scot WILSON, Jail Administrator at Anoka County Corrections & Workhouse, individually and in his official capacity; Matt HANSON, Facility Coordinator at Anoka County Corrections & Workhouse, individually and in his official capacity; Kurt WOSMEK, Supervisor in Anoka County Corrections Workhouse, in his individual and official capacity; the Nursing Director at Anoka County Corrections & Workhouse, individually and in her official capacity; Jenn SIMLER, Medical Provider at Anoka County Corrections Workhouse, individually and in her official capacity; | COMPLAINT<br>SEEKING MONEY<br>DAMAGES &<br>INJUNCTIVE<br>RELIEF<br><br>DEMAND FOR JURY<br>TRIAL |

ANOKA COUNTY CORRECTIONS )
WORKHOUSE MEDICAL STAFF; and, )
)
MEnD CORRECTIONAL CARE, PLLC, a )
Minnesota business entity; Todd )
LEONARD, Manager of MEnD )
CORRECTIONAL CARE; MEnD )
CORRECTIONAL CARE MEDICAL )
STAFF, )
)
)
      Defendants. )
_____ )

## <u>GENERAL INTRODUCTION</u>

1.    This is an action under 42 U.S.C. § 1983 seeking money damages as compensation for Defendants' violation of Plaintiff's constitutional rights under the Fourteenth Amendment to the United States Constitution.

2.    This action also states common law claims for negligence pursuant to MINN. STAT. § 466.02.

3.    Plaintiff's claims against individuals employed by any named municipality are aimed at each defendant in their individual *and* official capacities (differentiated by claim).

4.    Plaintiff's claims against Sherburne County, Sherburne County Jail, Anoka County, and Anoka County Corrections Workhouse seek to hold the municipal entity responsible for the actions of its agents and employees which include but are not limited the named and unnamed defendants.

5.    Jurisdiction is based upon 28 U.S.C. §§ 1331 and 1343 and claim joinder is appropriate under Fed. R. Civ. P. 18.

6.  Party joinder is appropriate under Fed. R. Civ. P. 19(a)(1) because the absence of defendants from Sherburne County, Anoka County, and MEnD Correctional Care, PLLC would: (a) prevent the Court from affording complete relief among existing parties, and (b) disposing of Plaintiff's claims without joining these parties may practically impair or impede Plaintiff's ability to protect Plaintiff's constitutional rights or leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations.

7.  Party joinder is also appropriate under Fed. R. Civ. P. 20 because Plaintiff's claims against Defendants assert joint and several liability amongst one or more defendants. Likewise, Plaintiff's claims arise out of the same transaction, occurrence, or series of transactions or occurrences. Plaintiff's claims present questions of law or fact common to all Defendants.

8.  Throughout June, July, and August of 2021, Sherburne County, its staff, and its medical providers (i.e., MEnD Correctional Care staff) subjected Jeremy, a pretrial detainee, to medical deprivation amounting to cruel and unusual punishment, and thus violated Jeremy's substantive and procedural due process rights under the Fourteenth Amendment to the U.S. Constitution. To the extent that Jeremy was convicted of a crime at any point during the relevant time period, Sherburne County, its staff, and its medical providers subjected Jeremy to cruel and unusual punishment that violated Jeremy's rights under the Eighth Amendment to the U.S. Constitution.

9.      On June 9, 2021, Plaintiff Jeremy Riddle first complained to the medical staff at Sherburne County Jail of pain resulting from a hernia.

10.     Throughout June and July of 2021, Plaintiff made multiple requests to be seen and filed several grievances begging for an explanation as to why he was not receiving adequate medical care.

11.     Plaintiff was not seen for further diagnostic testing or provided with a treatment plan until Plaintiff retained counsel and, through counsel, notified Defendants of such. Plaintiff was ignored by Defendants for months, despite clearly being in need of medical attention.

12.     Throughout November and December of 2021 and January and February of 2022, Anoka County, its staff, and its medical providers (i.e., MEnD Correctional Care) subjected Jeremy, a pretrial detainee, to medical deprivation amounting to cruel and unusual punishment, and thus violated Jeremy's substantive and procedural due process rights under the Fourteenth Amendment to the U.S. Constitution. To the extent that Jeremy was convicted of a probation violation in November of 2021, Anoka County, its staff, and its medical providers subjected Jeremy to cruel and unusual punishment that violated Jeremy's rights under the Eighth Amendment to the U.S. Constitution.

13.     When Plaintiff was put into Anoka County's custody, Plaintiff informed Anoka County Jail's medical providers that he had a hernia and signed releases of information ("ROIs") that permitted Anoka County Jail's medical staff to get Jeremy's medical records from Sherburne County and M Health Fairview

Northland Medical Center. Shortly after Plaintiff signed these ROIs, the Anoka County defendants had records conclusively demonstrating that Plaintiff had a hernia that requires a surgery.

14. Despite knowing that Plaintiff needs a surgery, neither the Anoka County defendants nor the MEnD Correctional Care defendants made any efforts to schedule a surgery for Plaintiff.

15. As a result of their unjustified delay in medical care, Defendants caused Plaintiff to suffer through a condition which caused immense pain and threatened Plaintiff's long-term health for many months without treatment. Plaintiff's hernia is visibly worsening. Defendants violated Plaintiff's constitutional rights under the Eighth and Fourteenth Amendments.

16. To date, Plaintiff has still yet to have the surgery he needs. Rather than working with Plaintiff to get him the medical care required, all Defendants have ignored Plaintiff's obvious need for medical care.

17. Defendants' violations of Jeremy's constitutional rights are a result of unconstitutional policies and customs, for which Defendants must be held jointly and severally liable.

18. Defendants breached their duty of reasonable care to (1) respond to legitimate requests for medical care in a timely fashion and (2) provide appropriate treatment to medical concerns. Defendants breached this duty by ignoring Plaintiff's requests to be seen by a provider, by failing to pursue appropriate diagnostic testing, and by ignoring numerous requests for treatment.

## PARTIES

### Plaintiff

19.  Plaintiff Jeremy Riddle [hereinafter "Jeremy"] is 37 years old. Jeremy was in custody at the Sherburne County Jail from December 3, 2020 to August 23, 2021, before being furloughed to attend treatment programs. On November 10, 2021, Jeremy was arrested and taken into Anoka County Jail's custody for a probation violation. Jeremy pleaded guilty to the probation violation on November 29, 2021. On January 4, 2022, Jeremy was transferred from the Anoka County Jail to the Anoka County Corrections Workhouse where he remains incarcerated. Jeremy's anticipated release date is March 28, 2022.

### Sherburne County Defendants

20.  Defendant Sherburne County [hereinafter "Sherburne"] is a local government unit of the state of Minnesota. In its capacity as a local government unit, it has implemented, executed, and adopted the policies relevant to this action.

21.  Defendant Sherburne County Jail [hereinafter "Sherburne County Jail" or "the Jail"] is a regional correctional facility located in Elk River, Minnesota. The Jail houses inmates and detainees under the control of Sherburne County, Federal Immigration and Customs Enforcement, Federal U.S. Marshals, Bureau of Indian Affairs, and other agencies.

22.  Defendant Joel Brott ("Brott") is, and at all times relevant was, the Sheriff of Sherburne County. Brott has served as Sherburne County Sheriff since January of 2009. As Sheriff, Brott is responsible for the leadership and oversight of the

Jail and for the care, custody, and treatment of all persons confined in the Jail. He is sued individually and in his official capacity.

23.    Defendant Brian Frank ("Frank") is, and at all times relevant was, the Jail Administrator for Sherburne County Jail. He is responsible for the operation and administration of the Jail and for the care, custody, and treatment of all persons confined in the Jail. He is sued individually and in his official capacity.

24.    Defendant Diana Vanderbeek ("Vanderbeek") is, and at all times relevant was, the Nursing Director at Sherburne County Jail. She is responsible for the operation and administration of nursing within the Jail and for the medical care and treatment of all persons confined in the Jail. She is sued individually and in her official capacity. Vanderbeek is employed by MEnD Correctional Care, PLLC.

25.    Defendant Melissa Burgess ("Burgess") is, and at all times relevant was, a Medical Provider at Sherburne County Jail. She is responsible for the operation and administration of medical care within the Jail and for the medical care and treatment of all persons confined in the Jail. She is sued individually and in her official capacity. Burgess is employed by MEnD Correctional Care, PLLC.

26.    Defendant Sherburne County Medical Staff ("Sherburne County Medical Staff") is comprised of nurses, doctors, and correctional officers tasked with the medical care of inmates within the Sherburne County Jail whose identities are unknown at this time.

27.    Together, Defendants Brott, Frank, Vanderbeek, Burgess, and Medical Staff may be collectively referred to as "Sherburne County Jail Administrators and Staff."

28.    Defendants have actual or constructive knowledge of the policies, practices, acts, and omissions complained of herein. All of the policies, practices, acts, and omissions alleged are intentional policies, practices, acts, and omissions of Defendants.

### Anoka County Defendants

29.    Defendant Anoka County [hereinafter "Anoka"] is a local government unit of the state of Minnesota. In its capacity as a local government unit, it has implemented, executed, and adopted the policies relevant to this action.

30.    Defendant Anoka County Corrections & Workhouse [hereinafter "Anoka County Jail" or "the Jail" or "the Workhouse"] is a regional correctional facility located in Anoka, Minnesota. The Jail consists of a main Jail, and a separate Workhouse. The Jail and Workhouse house inmates and detainees under the control of Anoka County.

31.    Defendant Scott Wilson ("Wilson") is, and at all times relevant was, the Jail Administrator for Anoka County Jail. He is responsible for the operation and administration of the Jail and Workhouse and for the care, custody, and treatment of all persons confined in the Jail and Workhouse. He is sued individually and in his official capacity.

32.     Defendant Matt Hanson ("Hanson") is, and at all times relevant was, the Jail
        Facility Coordinator. He is responsible for the operation and administration of
        the Jail and Workhouse, and for the care, custody, and treatment of all persons
        confined in the Jail and Workhouse. He is sued individually and in his official
        capacity.

33.     Defendant Kurt Wosmek ("Wosmek") is, and at all times relevant was, the
        Supervisor in Anoka County Corrections Workhouse. He is responsible for the
        operation and administration of the Workhouse, and for the care, custody, and
        treatment of all persons confined in the Workhouse. He is sued individually and
        in his official capacity.

34.     The Defendant Nursing Director(s) of the Anoka County Jail and/or Workhouse,
        if any, are responsible for the operation and administration of nursing within the
        Jail and for the medical care and treatment of all persons confined in the Jail.
        He/she/they is/are sued individually and in their official capacity. The name of
        this employee (if any) is not yet known to Plaintiff and is not publicly available.

35.     Defendant Jenn Simler ("Simler") is, and at all times relevant was, a Medical
        Provider at Anoka County Jail. She is responsible for the operation and
        administration of medical care within the Jail and for the medical care and
        treatment of all persons confined in the Jail. She is sued individually and in her
        official capacity. Simler is employed by MEnD Correctional Care, PLLC.

36.     Defendant Anoka County Jail Medical Staff ("Anoka County Medical Staff") is
        comprised of nurses, doctors, and correctional officers tasked with the medical

care of inmates within the Anoka County Jail & Workhouse whose identities are unknown at this time.

37.     Together, Defendants Wilson, Hanson, Nursing Director, Simler, and Medical Staff may be collectively referred to as "Anoka County Jail Administrators and Staff."

### Other Defendants

38.     Defendant MEnD Correctional Care, PLLC is a Minnesota business entity with a Registered Office Address of 67 – 10th Ave. S., Waite Park, MN 53687 and a Principal Executive Office Address of 1908 Kruchten Court S., Sartell, MN 56377. MEnD Correctional Care is performing the functions of a state/municipal or quasi-state/municipal actor by providing medical services to incarcerated individuals in the care of Sherburne County Jail and/or Anoka County Jail.

39.     Defendant Todd Leonard ("Leonard") is the Registered Agent and Manager of MEnD Correctional Care, PLLC. Leonard alleges that he is a Doctor of Medicine. As the Manager of MEnD Correctional Care, PLLC, Leonard is responsible for supervising and controlling the actions of his employees.

40.     On January 21, 2022, Minnesota's State Medical Board suspended indefinitely Leonard's license after finding that Leonard "demonstrated a willful or careless disregard for the health, welfare or safety of the patient, whom it did not name." *See* Kirsti Marohn, *MN Board Suspends Medical License of Jail Doctor*, MPR

NEWS (Jan. 26, 2022), https://www.mprnews.org/story/2022/01/26/board-suspends-medical-license-of-jail-doctor.

41.     MEnD Correctional Care, PLLC obtained its contract to provide medical services to inmates at Anoka County Jail by defrauding Anoka County and/or misleading or intentionally omitting from its bid information about pending or past litigation, including numerous recent lawsuits against MEnD Correctional Care, at least one of which settled for more than one million dollars. *Accord* Brandon Stahl et al., *KARE 11 Investigates: Jail Medical Contract Awarded Based on Misleading Information*, KARE 11 (updated Oct. 29, 2021), https://www.kare11.com/article/news/investigations/kare-11-investigates-anoka-county-jail-mend-correctional-care-contract/89-fbec7088-8534-4b7f-b100-b129084d861e. Anoka County was negligent in performing due diligence and investigating whether MEnD Correctional Care had any pending or past lawsuits against it in the absence of MEnD Correctional Care's affirmative disclosures.

## All Defendants

42.     Defendants have actual or constructive knowledge of the policies, practices, acts, and omissions complained of herein. All of the policies, practices, acts, and omissions alleged are intentional policies, practices, acts, and omissions of Defendants.

## JURISDICTION

43.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. § 1343 (civil rights jurisdiction), and 42 U.S.C. §§ 1983,

1988. Supplemental jurisdiction over state claims is appropriate as the events in question "derive from a common nucleus of operative fact." 28 U.S.C. § 1367; *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966).

## VENUE

44.   Venue properly lies in the District of Minnesota pursuant to 28 U.S.C. § 1391(e)(1) because all the events giving rise to this claim occurred in this district, all Defendants reside in this district, and no real property is involved in this action.

## EXHAUSTION

45.   The Prisoner Litigation Reform Act "requires proper exhaustion, meaning 'complet[ing] the administrative review process in accordance with the applicable rules.'" *Downey v. Pennsylvania Dep't of Corr.*, 968 F.3d 299, 305 (3d Cir. 2020) (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)). "These procedural rules are supplied by the individual prisons." *Downey*, 968 F.3d at 305 (citing *Jones v. Bock*, 549 U.S. 199, 218 (2007)).

46.   Jeremy has exhausted or has constructively exhausted all administrative remedies required by Sherburne County.

47.   Jeremy filed grievances in accordance with Sherburne County Jail's policies and procedures. These grievances either went unaddressed or were responded to in a manner that did not address Jeremy's concerns.

48.   Sherburne County Defendants failed time and time again to adequately respond to the deprivation of Jeremy's basic need for sufficient medical attention.

49. Sherburne County Defendants have adopted a practice or custom of ignoring formal and informal grievances or of diverting such grievances.

50. Any further administrative exhaustion by Jeremy would be unduly duplicative, unduly burdensome, and futile.

51. Jeremy has exhausted or has constructively exhausted all administrative remedies required by Anoka County.

52. Jeremy filed grievances in accordance with Anoka County Jail's policies and procedures. These grievances either went unaddressed or were responded to in a manner that did not address Jeremy's concerns.

53. Anoka County Defendants failed time and time again to adequately respond to the deprivation of Jeremy's basic need for sufficient medical attention.

54. Anoka County Defendants have adopted a practice or custom of ignoring formal and informal grievances or of diverting such grievances.

55. Any further administrative exhaustion by Jeremy would be unduly duplicative, unduly burdensome, and futile.

## FACTUAL BACKGROUND

56. Sherburne County Jail is a secure building located in Elk River, Minnesota, in the County of Sherburne.

57. The Jail is utilized to confine individuals awaiting trial or those sentenced to serve times for various criminal and civil offenses.

58. Jeremy was incarcerated at Sherburne County Jail from December 3, 2020 to August 23, 2021.

59.    Between August 23, 2021 and November 10, 2021, Jeremy was furloughed (but still in the custody of Sherburne County) for purposes of attending a treatment program.

60.    On November 10, 2021, Jeremy was transferred from his treatment program (and Sherburne's custody) to the custody of Anoka County Jail. Jeremy was transferred from Anoka County Jail to the Anoka County Workhouse on January 4, 2022 where he remains incarcerated.

61.    On June 9, 2021, Jeremy submitted a medical request to the Sherburne County Jail medical staff. He reported, "I've got a hernia and it hurts bad." He then added, "Need to be seen ASAP."

62.    The request was received by Sherburne County Jail staff the same day. Jeremy was then seen by a nurse who reportedly looked at the location of the hernia, without doing further testing or checking for other symptoms.

63.    After this interaction with medical staff, Jeremy was sent away feeling ignored and neglected. Even worse, he was still in immense pain with no real resolution provided. A medical inmate memo stated that "no additional action [was] needed for [his] hernia at [that] time." Jeremy was told to merely watch for complications. The only remedy for his pain the staff provided was ibuprofen. The memo was signed by a "Naomi, RN."

64.    Because of this, Jeremy subsequently filed a formal grievance on June 10, 2021. In his grievance, Jeremy expressed frustration at the fact that he had been told that no action would be taken to resolve his medical concerns. He also requested

that medical staff photograph the hernia and add the photograph to his medical records. There is no indication that this request was ever fulfilled.

65.    On June 11, 2021, Jeremy filed another formal grievance, after he noticed that he had been charged for the medical visit the previous day. Jeremy noted that he was not seen by the doctor on staff and was told that the medical staff would not be taking further action to address his hernia. Because "nothing was done," he felt it was extremely unfair that he was charged for the visit.

66.    In response to both the grievance from June 11 and the previous one from June 10, Sherburne County responded with only three sentences. Their grievance response in its entirety reads: "Any patient initiated sick call is subject to a $5.00 charge. Not all RN visits lead to a provider visit. Your condition was reviewed with the provider and nothing to be done [*sic*] further at this time." This response was signed by Defendants Van Der Beek and Burgess and states that it was reviewed by Defendant Frank.

67.    On June 18, 2021, Jeremy submitted another formal grievance. Once again, he expressed frustration with the fact that he was charged for an RN visit despite the fact that he was not seen by a provider and he was told that no further action would be taken.

68.    Sherburne County Jail staff responded to the June 18 grievance stating, "Any patient initiated sick call is subject to a $5.00 charge. … The provider reviewed the visit that you had with the nurse and decided there was nothing more to do at

this time." This response was signed by Defendants Van Der Beek and Burgess.

It also stated that it had been reviewed with Defendant Frank.

69.     On June 30, after unsuccessfully trying to receive care for his painful hernia,

Jeremy submitted an "inmate kite," also used as an informal grievance. This

grievance once again complained about the staff's lack of response to Jeremy's

medical concerns.

70.     The grievance stated: "I want to know why I wasn't seen by a medical provider

for my hernia and what the reason is that nothing is going to be done about it."

The grievance was received by staff on June 30.

71.     A week later, on July 7, 2021, Jeremy finally received a response. It merely

stated: "RN assessment discussed w/ medical provider who determined plan of

care." After failing to answer the questions in his grievance, the staff told Jeremy

to "[p]lease place a medical request if you have further questions." The response

appears to have been signed by Defendant Van Der Beek.

72.     On July 9, Jeremy submitted a new medical request. This one simply said that he

had a hernia and needed to be seen. After this request, Jeremy was once again

not seen by a medical provider. In fact, his medical request was practically

ignored—he was not called to medical and was not seen even by an RN.

73.     Instead of examining Jeremy or otherwise acting on his medical request, a

medical inmate memo was sent that stated, "When seen for your hernia

previously, it was noted by the provider that it does not require intervention."

74.   The provider who gave this response, named only as "Clinic, RN," had made this assessment without actually examining Jeremy. Moreover, this assessment was made over a month after Jeremy had been initially seen by an RN.

75.   On July 11, Jeremy submitted yet another medical request stating that he was suffering from a hernia and needed to be seen. Once again, Jeremy was not called to medical on the date of his request.

76.   The following day, July 12, 2021, Jeremy finally received a medical inmate memo informing him that the provider ordered an ultrasound for his hernia. This memo was signed by a "Naomi, RN."

77.   On August 2, 2021, Jeremy submitted two additional formal grievances. He had been charged $5.00 once again for the same ongoing issue. He had already paid a $5.00 copay for his medical requests regarding his hernia and still no action had been taken.

78.   On August 9, 2021, Defendant Brian Frank replied that the $5.00 copay would be reimbursed and that Jeremy "ha[d] been set up already to consult with a surgeon, which I am told you are already aware of."

79.   Between the time Jeremy was told an ultrasound would be ordered and Defendant Brian Frank's response that Jeremy was set up to consult with a surgeon, four full weeks had passed without any progress to Jeremy's medical care.

80.   On August 10, 2021, Jeremy appealed the formal grievances he had filed on June 10, June 11, and June 18. He stated "I feel as if my medical needs were ignored" and "I signed up for sick call and was not even called down to be seen by

medical." He also stated, "Because of this I'm facing more time in pain and future problems because my hernia was not looked at by a medical provider."

81. Records indicate that the appeal was received on August 11, 2021, yet Jail staff simply noted that "[t]his has been addressed an no further action taken."

82. On August 10, Jeremy was finally seen by a medical provider at M Health Fairview Northland Medical Center ("M Health").

83. Records from the office visit at M Health note that Jeremy's right groin contained a "large bulge; first noted a few months ago." The bulge was "[r]educible *but will come right back out*." (emphasis added).

84. The medical staff at M Health also identified a smaller hernia on Jeremy's left side.

85. M Health staff recommended a surgical procedure which would involve "reduction and repair" and would "offer a very good likelihood of symptom relief." M Health staff also discussed with Jeremy "*possible problems or difficulties the patient may encounter if treatment was not pursued at this time*." (emphasis added).

86. Once Jeremy finally received the ultrasound, he was sent a letter from a nurse practitioner. The results showed that Jeremy had a "large right sided inguinal hernia." The letter further informed him that a referral had been placed for a surgical consult "as soon as possible."

87. An inguinal hernia "occurs when tissue…protrudes through a weak spot in the abdominal muscles. The resulting bulge can be painful."[1]

88. An individual with a suspected inguinal hernia "should seek medical attention. If it is not treated, an inguinal hernia can develop into a serious condition."[2]

89. An inguinal hernia "*will not heal on its own*." If a hernia causes symptoms or is growing, surgery is needed.[3]

90. "Inguinal hernias are *dangerous* because they tend to keep getting larger and your intestine can get trapped inside the bulge and lose blood supply."[4]

91. "The way to repair an inguinal hernia is usually with a surgical procedure. In adults with small hernias that *don't* cause symptoms, treatment may only be to watch it. *Adults with symptoms*…usually have surgery to prevent the possible complication of a strangulated hernia in the future."[5]

92. After two full months of begging to be seen, insisting that he was in need of medical attention, and continuously having his requests rejected, Jeremy was

---

[1] *Inguinal Hernia*, MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/inguinal-hernia/symptoms-causes/syc-20351547#:~:text=An%20inguinal%20hernia%20occurs%20when,hernia%20isn't%20necessarily%20dangerous (last visited Sept. 21, 2021).
[2] *Inguinal Hernia*, CLEVELAND CLINIC, https://my.clevelandclinic.org/health/diseases/16266-inguinal-hernia (last visited Sept. 21, 2021).
[3] *Inguinal Hernia*, MASS. GEN. HOSP., https://www.massgeneral.org/condition/inguinal-hernia (last visited Sept. 21, 2021) (emphasis added).
[4] *Inguinal Hernia*, JOHN HOPKINS MED., https://www.hopkinsmedicine.org/health/conditions-and-diseases/hernias/inguinal-hernia (last visited Sept. 21, 2021) (emphasis added).
[5] *Id.* (emphasis added).

finally able to receive meaningful diagnostic measures. By the time Jeremy was finally seen and examined, it was urgent enough that an immediate referral for a surgical consult was placed.

93.   Sherburne County finally scheduled a surgery for September 2, 2022, but by the time the surgery was scheduled, Jeremy had already been furloughed and the conditions of his court-approved furlough disallowed Jeremy from leaving his treatment facility to attend the surgical procedure; had Jeremy gone to the hospital without the court's approval, it would have constituted an escape under State law.

94.   The conditions of Jeremy's furlough disallowed him from attending a surgery that was scheduled for September 2, 2022, and this was made clear to Sherburne County through an email from Jeremy's counsel to the County Attorney for Sherburne County (Ms. Kathleen Heaney) that was sent on August 27, 2021, and which informed the County Attorney that the September 2, 2021 surgery date would not work and would need to be rescheduled.

95.   Sherburne County never made any efforts to reschedule Jeremy's surgery for a time after his furlough was completed. Instead, Sherburne County passed Jeremy off to Anoka County.

96.   On November 10, 2021, Jeremy was transferred from Sherburne County's custody to Anoka County's custody. At this time, Jeremy was transported by Anoka County staff from the treatment program he was in at Transformation

House to the Anoka County Jail; he was booked into the jail officially on November 11, 2021.

97. Shortly after being booked into the Anoka County Jail, the Jail's medical staff (i.e., MEnD Correctional Care staff) gave Jeremy a medical examination. At the medical examination, Jeremy informed the medical staff about his hernia, but medical staff did nothing other than check Jeremy's blood pressure.

98. For roughly one week, Anoka County Jail forced Jeremy to utilize the top bunkbed in his cell despite having a hernia that made it extremely difficult and painful for Jeremy to get up to and down from the top bunkbed. Eventually, a correctional officer (rather than nursing staff) told Jeremy he could switch to the bottom bunkbed after being informed of the problem.

99. The medical staff who 'examined' Jeremy at Anoka County Jail had Jeremy sign ROIs that allowed the staff to get Jeremy's medical records from M Health Fairview and from Sherburne County Jail. These records were obtained by Anoka County Jail's medical staff and conclusively demonstrated that Jeremy had an untreated hernia that requires surgery. Still, no surgery was scheduled.

100. Medical staff at Anoka County Jail also stopped providing Jeremy with medication he had previously been prescribed and provided with; the categories of medication that were withheld from Jeremy included anti-depressants, blood pressure pills, and vitamins. Jeremy filed a kite asking for these medications to resume and was given a return kite by Jail staff saying that Jeremy would be

switched to other medications, but there was never any follow-up and Jeremy is still not receiving the medications he was prescribed and previously receiving.

101. On November 24, 2021, Jeremy pleaded guilty to a probation violation in Anoka County and was sentenced to 180 days at the Anoka County Workhouse.

102. On January 4, 2022, Jeremy was transferred to the Anoka County Workhouse.

103. Around the end of January 2022, Jeremy spoke with Defendant Simler, who informed Jeremy (orally) that they would set up an appointment for him to see a surgical provider soon. However, no appointment was ever set.

104. On February 3, 2022, Jeremy filed a kite asking when he would see a medical provider to set up his surgery.

105. On February 4, 2022, Defendant Simler responded to Jeremy's kite and informed Jeremy that it is not necessary for him to see a medical provider because he is being released soon.

106. Sometime between February 7, 2022 and February 11, 2022, a nurse at the Anoka County Workhouse told Jeremy he would be allowed to see a medical provider on February 17, 2022 to address his hernia and schedule a surgery.

107. On February 16, 2022, the same nurse informed Jeremy that Jeremy was no longer scheduled to meet with the provider. The nurse informed Jeremy that he would not be seeing the provider because the provider, who is located in Princeton, Minnesota, which the nurse deemed to be too far away to justify keeping Jeremy's appointment.

108.   The nurse told Jeremy that Defendant Matt Hanson and other jail employees have final say as to whether Jeremy can be transported to his medical appointment, but when Jeremy asked Defendant Hanson about it, Defendant Hanson informed Jeremy that it was up to the nurse as to whether to schedule or keep a medical appointment.

109.   Defendant Matt Hanson also told Jeremy that his surgery was not "medically necessary."

110.   The relevant Defendant nurse told Jeremy that administrative concerns were at least part of the reason as to why Jeremy would not be allowed to meet with the medical provider in Princeton, Minnesota. The nurse told Jeremy that if he was HUBER (i.e., on work-release and therefore allowed to leave and reenter the facility), he would be permitted to arrange a ride to pick him up from the Anoka County Workhouse to take him to and from his appointment in Princeton, but since Jeremy was not HUBER, he would not be able to keep his doctor's appointment.

111.   Defendant Wosnak, Supervisor at the Anoka County Workhouse, and Defendant Hanson both have actual knowledge of Jeremy's hernia and has spoken briefly to Jeremy about the hernia.

112.   Defendant Wosnak and Defendant Hanson could help assist Jeremy in getting a surgery scheduled, but have not done so.

## INJURIES

113.   At minimum, the injuries Jeremy suffered rise to the level of "substantial bodily harm," as that term is defined by MINN. STAT. § 609.02, subd.7a.

114.   The injuries Jeremy suffered also rise to the level of "great bodily harm," as that term is defined by MINN. STAT. § 609.02, subd.8.

115.   Jeremy suffered severe pain for well over a month before ever being seen by a medical provider at the County Jail.

116.   By the time Jeremy finally received an ultrasound, M Health medical staff immediately determined that Jeremy's hernia required surgery.

117.   This chain of events evidences that Jeremy was suffering from a real and immediate medical condition which went untreated for more than six months while he battled with Sherburne County Administrators and Staff to be seen and treated.

118.   Had Sherburne County and MEnD Correctional Care Defendants not unduly delayed in treating Jeremy's obvious health needs, a surgery would have been scheduled before Jeremy was furloughed, and this would have saved Jeremy months of unnecessary pain and discomfort.

119.   Had Anoka County and MEnD Correctional Care Defendants not unduly delayed in treating Jeremy's obvious health needs, Jeremy could have had surgery three or more months ago, thereby saving Jeremy months of unnecessary pain and discomfort.

120. To this day, Jeremy remains in severe pain as his hernia has yet to be surgically addressed as a result of Defendants' conduct in denying and delaying medical care.

121. Jeremy's hernia is getting worse. It is constantly outside of his body, and comes out immediately if Jeremy tries to push it back in. It is growing in size, and is increasingly concerning in visual appearance. Jeremy can cup his entire hand around his hernia. The pain associated with Jeremy's hernia is often immense.

122. In addition to physical injury, Jeremy has suffered extreme emotional distress, in the form of pain and suffering, as a result of Defendants' intentional actions.

## CLAIMS FOR RELIEF

123. Defendants' deliberate indifference to Jeremy's medical needs violated his Fourteenth Amendment Rights to substantive and procedural due process.

124. To the extent that Jeremy was convicted of a crime at any point during the relevant time period, Defendants' deliberate indifference to Jeremy's medical needs violated his Eighth Amendment rights to be free from cruel and unusual punishment.

125. Defendant Sherburne County's policies and customs of encouraging and tacitly approving of this deliberate indifference were the moving force behind Defendants' conduct in a manner sufficient for liability to attach under *Monell* and *Canton*. *See City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *Monell v. Dep't of Soc. Services of City of New York*, 436 U.S. 658, 691 (1978).

126.   Defendants Sherburne County Jail, Brott, and Frank breached their duty to oversee and provide for the wellbeing of Sherburne County Jail inmates, which constitutes negligence under Minnesota tort law.

127.   Defendants Anoka County Jail, Wilson, Hanson, and Wosmek breached their duty to oversee and provide for the wellbeing of Anoka County Jail inmates, which constitutes negligence under Minnesota tort law.

## Count 1: 42 U.S.C. § 1983 – Fourteenth Amendment Violation of Jeremy's Substantive Due Process Rights

(Plaintiff v. All Defendants)

128.   Plaintiff realleges and incorporates herein by reference all preceding and all subsequent paragraphs of this Complaint.

129.   By failing to provide adequate medical care, Defendants violated Jeremy's Fourteenth Amendment Rights to substantive and procedural due process.

130.   As a pretrial detainee, Jeremy's right to medical care arises under the Due Process Clause of the Fourteenth Amendment. *Jackson v. Buckman*, 756 F.3d 1060, 1065 (8th Cir. 2014); *Vaughn v. Green Cnty.*, 438 F.3d 845, 850 (8th Cir. 2006).

131.   "[D]enial of medical care may result in pain and suffering which no one suggests would serve any penological purpose. … The infliction of such unnecessary suffering is inconsistent with contemporary standards of decency." *Estelle v. Gamble*, 429 U.S. at 104. "[D]eliberate indifference to serious medical needs of

prisoners constitutes the 'unnecessary wanton infliction of pain' proscribed by the Eighth Amendment." *Id.* (internal citations omitted).

132. The deliberate indifference standard that governs Eighth Amendment claims also governs claims of medical deprivation under the Due Process Clause of the Fourteenth Amendment. *See Jackson*, 756 F.3d at 1065; *Fourte v. Faulkner Cnty.*, 746 F.3d 384, 387 (8th Cir. 2014); *Vaughn*, 438 F.3d at 850.

133. To succeed on a claim for deprivation of medical care, an inmate must show that officials were "deliberately indifferent to the inmate's serious medical needs." *Schaub v. VonWald*, 638 F.3d 905, 914 (8th Cir. 2011). This requires a showing that 1) the inmate suffered from a serious medical need and 2) the officials knew of the need "yet deliberately disregarded it." *Id.*

134. A serious medical need is "one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that a layperson would easily recognize the necessity for a doctor's attention." *Cambreros v. Branstad*, 73 F.3d 174, 176 (8th Cir. 1995).

135. Jeremy's hernia repair is a serious medical need that is "so obvious that a layperson would easily recognize the necessity for a doctor's attention." *Id.* Clearly, Jeremy was able to identify his ailment before even receiving a physical exam.

136. Hernias are widely known to be painful and serious, and they almost always require surgical intervention. *See Delker v. Maas*, 843 F. Supp. 1390, 1401 (D. Or. 1994) ("[M]edical professionals agree that surgical repair is the standard

treatment for an inguinal hernia, surgery would not pose an unreasonable risk to the patient, and the operation would likely have alleviated symptoms.").

137.  A serious medical need is further present whenever the "failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." *Clement v. Gomez*, 298 F.3d 898, 904 (9th Cir. 2002) (citations and internal quotations omitted).

138.  Deliberate indifference may be demonstrated when medical care is intentionally delayed or denied, or when doctors fail to respond to an inmate's serious medical needs. *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997) (citing *Estelle*, 429 U.S. at 104-05). In other words, an inmate must demonstrate that a medical provider's actions were "so inappropriate as to evidence intentional maltreatment or a refusal to provide essential care." *Jackson¸* 756 F.3d at 1066 (quoting *Dulany*, 132 F.3d at 1240-41).

139.  The nation's leading hospital systems[6] clearly state that a hernia like Jeremy's does not go away or improve on its own and requires surgery. Surgical intervention for symptomatic hernias is widely understood to be the common-sense approach within the medical community. *See supra*.

140.  Jeremy requested medical care for an objectively serious medical need and

---

[6] Mayo Clinic, Cleveland Clinic, Massachusetts General Hospital, and John Hopkins Hospital are the nation's best hospitals. *See World's Best Hospitals 2021*, NEWSWEEK, https://www.newsweek.com/best-hospitals-2021 (last visited Sept. 21, 2021); *see also supra* nn. 1-5. All four of these hospitals are also listed in the top five hospitals globally. *World's Best Hospitals 2021*, *supra* n. 6.

Defendants "actually knew of but deliberately disregarded his serious medical need." *Scott v. Benson¸* 742 F.3d 335, 340 (8th Cir. 2014) (citing *Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir. 1997)).

141.  Defendants, under the color of state law and influenced by nonmedical factors, refused to treat Jeremy anyway and thus acted with deliberate indifference to Jeremy's medical needs in violation of the Fourteenth Amendment to the United States Constitution.

142.  As a direct and proximate result of Defendants' actions, Jeremy suffered injuries including but not limited to, physical injury, emotional trauma, loss of access to justice, and pain and suffering.

143.  Thus, Defendants violated the Fourteenth Amendment and 42 U.S.C. § 1983.

### Count 2: 42 U.S.C. § 1983 – Fourteenth Amendment Violation of Jeremy's Right to Procedural Due Process

(Plaintiff v. All Defendants)

144.  Plaintiff realleges and incorporates herein by reference all preceding and all subsequent paragraphs of this Complaint.

145.  "[T]here can be no doubt that at a minimum [the Due Process Clause] require[s] that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Armstrong v. Manzo*, 380 U.S. 545, 550 (1965) (quoting *Mullane v. Central Hanover Bank & Tr. Co.*, 339 U.S. 306, 313 (1950)). Therefore, a pretrial detainee "may not be

punished prior to an adjudication of guilt in accordance with due process of law." *Bell v. Wolfish*, 441 U.S. 520, 535 (1979).

146. "The constitutional rights of a pretrial detainee… flow from both the procedural and substantive due process guarantees of the Fourteenth Amendment." *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 639 (5th Cir. 1996) (citing *Bell*, 441 U.S. 520).

147. "A person lawfully committed to pretrial detention has not been adjudged guilty of any crime. … Under such circumstances, the Government…may detain him to ensure his presence at trial and may subject him to the restrictions and conditions of the detention facility *so long as those conditions and restrictions do not amount to punishment, or otherwise violate the Constitution*." *Id.* at 536-37 (emphasis added) (internal citations omitted).

148. Jeremy had a liberty interest to be free from punishment while confined as a pretrial detainee.

149. By subjecting Jeremy not only to conditions that amount to punishment, but that amount to cruel and unusual punishment even for convicted prisoners, Defendants deprived Jeremy of this liberty interest without due process of law. *See Hare*, 74 F.3d at 650 ("The Due Process Clause proscribes any punishment of pretrial detainees, cruel and unusual or otherwise.").

150. As a direct and proximate result of Defendants' actions, Jeremy suffered injuries including but not limited to, physical injury, emotional trauma, loss of access to justice, and pain and suffering.

151.    Thus, Defendants violated the Fourteenth Amendment and 42 U.S.C. § 1983.

### Count 3: 42 U.S.C. § 1983 – Eighth Amendment Violation

(Plaintiff v. Anoka County Defendants and MEnD Correctional Care, PLLC)

152.    Plaintiff realleges and incorporates herein by reference all preceding and all subsequent paragraphs of this Complaint.

153.    "The government… has an obligation to provide medical care for those whom it is punishing by incarceration." *Delker*, 843 F. Supp. at 1398 (citing *Estelle*, 429 U.S. at 103). The Eighth Amendment duty to provide medical care "applies to medical conditions that may result in pain and suffering which serve no legitimate penological purpose." *Id. See also McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992) (finding that a delay in surgery resulted in needless infliction of pain); *Jones v. Johnson*, 781 F.2d 769, 771-72 (9th Cir. 1986) (determining that a hernia which results in pain and suffering is a serious medical need which prison doctors cannot ignore).

154.    Defendants refused to treat his medical condition that was obviously in need of treatment, even after being made aware of Jeremy's obvious medical condition.

155.    Thus, Defendants subjected Jeremy to conditions that amount to cruel and unusual punishment and violated his rights under the Eighth Amendment.

156.    As a direct and proximate result of Defendants' actions, Jeremy suffered injuries including but not limited to, physical injury, emotional trauma, loss of access to justice, and pain and suffering.

157.    Thus, Defendants violated the Eighth Amendment and 42 U.S.C. § 1983.

## Count 4: *Monell* and *Canton* Municipal Liability

### (Plaintiff v. Sherburne County)

158.   In *Canton*, the Court held that a municipal entity can be held liable under § 1983 for inadequate training when "the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989); *see also DeGidio v. Pung*, 920 F.2d 525, 532 (8th Cir. 1990). This liability attaches when the failure to train amounts to a policy or custom. *Id.*

159.   A "policy" for purposes of § 1983 liability may arise when:

> [I[n light of the duties assigned to specific officers or employees **the need for more or different training is so obvious**, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.

*Canton*, 489 U.S. at 390 (emphasis added).

160.   A "consistent pattern of reckless or negligent conduct is sufficient to establish deliberate indifference to serious medical needs" to establish Sherburne County's liability. *DeGidio*, 920 F.2d 533.

161.   Sherburne County, through its fellow Defendants, exhibited the requisite "deliberate indifference" to constitutional rights to illustrate a custom or policy and for municipal liability to attach to the conduct of County Jail Administrators and Staff. *City of Canton v. Harris*, 489 U.S. 378, 385 (1989).

162.   This indifference was evidenced by County Jail Administrators and Staff consistent pattern of continuously ignoring Jeremy's requests for medical care, despite his written grievances.

163.   The indifference to Jeremy's pleas and requests resulted in the foreseeable deprivation of Jeremy's constitutional rights.

164.   Despite its knowledge the custom and practice of ignoring these medical requests, Sherburne County failed to implement measures to address the pattern and as a result, the abuses set forth previously, and more, occurred during Jeremy's incarceration at Sherburne County Jail.

165.   Sherburne County demonstrated deliberate indifference to the needs of its inmates' medical concerns by hiring a company to provide inmates with medical care that was headed by a doctor who was disciplined in 2011 for what the Minnesota Board of Medical Practice described as "unethical and professional conduct, failure to maintain adequate medical records, and inappropriate prescribing practices."

166.   "A municipality has no immunity from liability under § 1983 flowing from its constitutional violations and may not assert the good faith of its officers as a defense to such liability." *Owen v. City of Independence*, 445 U.S. 622, 622 (1980). Accordingly, Sherburne County's liability must attach because the imputed policies themselves were unconstitutional.

167.  As a direct and proximate result of Defendants' actions, Jeremy suffered injuries including but not limited to, physical injury, emotional trauma, loss of access to justice, and pain and suffering.

### Count 5: *Monell* and *Canton* Municipal Liability

(Plaintiff v. Anoka County)

168.  In *Canton*, the Court held that a municipal entity can be held liable under § 1983 for inadequate training when "the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989); *see also DeGidio v. Pung*, 920 F.2d 525, 532 (8th Cir. 1990). This liability attaches when the failure to train amounts to a policy or custom. *Id.*

169.  A "policy" for purposes of § 1983 liability may arise when:

> [I[n light of the duties assigned to specific officers or employees **the need for more or different training is so obvious**, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.

*Canton*, 489 U.S. at 390 (emphasis added).

170.  A "consistent pattern of reckless or negligent conduct is sufficient to establish deliberate indifference to serious medical needs" to establish Sherburne County's liability. *DeGidio*, 920 F.2d 533.

171.  Anoka County, through its fellow Defendants, exhibited the requisite "deliberate

indifference" to constitutional rights to illustrate a custom or policy and for municipal liability to attach to the conduct of County Jail Administrators and Staff. *City of Canton v. Harris*, 489 U.S. 378, 385 (1989).

172.    This indifference was evidenced by County Jail Administrators and Staff consistent pattern of continuously ignoring Jeremy's requests for medical care, despite his written grievances.

173.    The indifference to Jeremy's pleas and requests resulted in the foreseeable deprivation of Jeremy's constitutional rights.

174.    Despite its knowledge the custom and practice of ignoring these medical requests, Anoka County failed to implement measures to address the pattern and as a result, the abuses set forth previously, and more, occurred during Jeremy's incarceration at Anoka County Jail & Workhouse.

175.    Anoka County also demonstrated deliberate indifference to the needs of the inmates it houses in Anoka County Jail when it failed to investigate whether Anoka County Jail had any previous or pending litigation against it in relation to its ongoing provision of medical services to other jails in Minnesota. A brief search would have revealed numerous lawsuits against MEnD Correctional Care, which would have led any county that was not deliberately indifferent to the medical needs of its inmates to inquire about those lawsuits and past settlements.

176.    Anoka County demonstrated deliberate indifference to the needs of its inmates' medical concerns by hiring a company to provide inmates with medical care that was headed by a doctor who was disciplined in 2011 for what the Minnesota

Board of Medical Practice described as "unethical and professional conduct, failure to maintain adequate medical records, and inappropriate prescribing practices."

177. "A municipality has no immunity from liability under § 1983 flowing from its constitutional violations and may not assert the good faith of its officers as a defense to such liability." *Owen v. City of Independence*, 445 U.S. 622, 622 (1980). Accordingly, Anoka County's liability must attach because the imputed policies themselves were unconstitutional.

178. As a direct and proximate result of Defendants' actions, Jeremy suffered injuries including but not limited to, physical injury, emotional trauma, loss of access to justice, and pain and suffering.

## Count 6: Minn. Stat. § 466.02 – Negligence

(Plaintiff v. All Defendants)

179. Plaintiff realleges and incorporates herein by reference all preceding and all subsequent paragraphs of this Complaint.

180. Supplemental jurisdiction is proper given that this claim arises from a "common nucleus of operative fact." 28 U.S.C. § 1367; *Gibbs*, 383 U.S. 725 (1966).

181. Defendants owed Jeremy a duty to oversee and provide for the safety and well-being of Jeremy and others in their custody.

182. Defendants breached this duty when they allowed his inguinal hernia to go untreated for months despite his pleas for medical attention.

183. As a direct and proximate result of these Defendants' actions, Jeremy suffered injuries including but not limited to, physical injury, emotional trauma, loss of access to justice, and pain and suffering.

184. Thus, Defendants committed an actionable negligence tort under Minnesota law.

185. To the extent that MEnD Correctional Care is the employer of Defendants who were negligent, MEnD Correctional Care is vicariously liable for the torts of its employees.

186. To the extent that Sherburne County and/or Anoka County is/are the employer(s) of Defendants who were negligent (and/or MEnD Correctional Care), Sherburne County and/or Anoka County is/are vicariously liable for the torts of its employees.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiff respectfully requests that this Court grant the following relief:

A. With regards to claims 1-3 (§ 1983 claims), grant a money judgment against one or more Defendants for compensatory, special, and punitive damages together with costs and disbursements, including reasonable attorney's fees under 42 U.S.C. § 1988 and prejudgment interest.

B. With regard to claims 4-5 (*Monell* claim), grant a money judgment against Sherburne County and Anoka County for compensatory and special damages, together with costs and disbursements, including reasonable attorney's fees under 42 U.S.C. § 1988 and prejudgment interest.

C.     With regards to claim 6 (state law negligence claim), grant a money judgment against Defendants (and/or Sherburne County and/or Anoka County under MINN. STAT. 466.02) for compensatory and special damages, together with costs and disbursements.

D.     Issue an injunction or order compelling Defendants to schedule a surgery for Plaintiff as soon as possible.

E.     Grant such other relief as may be just and reasonable.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on all issues which may be tried by a jury pursuant to Rule 38 of the Federal Rules of Procedure.

DATED: February 18, 2022         Respectfully submitted,

                                  */s/ Nico Ratkowski*

                                  NICO RATKOWSKI
                                  MN Attorney ID: 0400413
                                  Contreras & Metelska, P.A.
                                  200 University Avenue W., STE 200
                                  Saint Paul, Minnesota 55103
                                  P: (651) 771-0019
                                  F: (651) 772-4300
                                  nico@contrerasmetelska.com

## <u>VERIFICATION OF COMPLAINT</u>

Nico Ratkowski, under penalty of perjury, states the following:

1. That he is an attorney employed by Contreras & Metelska, PA, the attorneys for

   Plaintiff in this case.

2. That he affirms the truth of the contents thereof upon information and belief, and

   he believes same to be true, and he further states that the sources of this

   information and belief are documents provided to him by Plaintiff, Defendant(s),

   and/or third-party witnesses.


DATED: February 18, 2022                     Respectfully submitted,

                                             /s/ *Nico Ratkowski*
                                             Nico Ratkowski
                                             MN Attorney ID: 0400413
                                             Contreras & Metelska, P.A.
                                             200 University Avenue W., STE 200
                                             Saint Paul, Minnesota 55103
                                             P: (651) 771-0019
                                             F: (651) 772-4300
                                             nico@contrerasmetelska.com

                                             *Attorney for Plaintiff*